Giulio Particelli v. Commissioner. Estate of Eletta Particelli, Deceased, Arthur Guerrazzi, Executor v. Commissioner.
Particelli v. Commissioner
Docket Nos. 25439, 25440.
United States Tax Court
1952 Tax Ct. Memo LEXIS 318; 11 T.C.M. (CCH) 150; T.C.M. (RIA) 52044; February 20, 1952
*318 In December 1943 there was a ceiling price on bulk sales of wine but no regulation fixing a maximum price on sales of a winery with its inventory of wine. Petitioner sold his inventory of wine and winery for $350,000 without an agreement on the consideration for each class of property. The written contract of sale specified an amount as the selling price of the wine and of the winery. Held, that the substance of the transaction was a sale of the wine and the winery for a lump sum and that of the total consideration, $275,000 was paid for the wine and $75,000 for the winery. Valentine Brookes, Esq., for the petitioners. Leonard Allen Marcussen, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion These proceedings were consolidated for hearing. Each case involves a deficiency in income tax for the year 1943 in the amount of $62,222.85 arising from community income. Issues settled by stipulation will be reflected in the computation under Rule 50. The only remaining issue, which is common to both proceedings, is whether respondent erred in his allocation of community income derived from the sale of an inventory of wine and a winery. The returns *319 of the petitioners were filed with the collector at San Francisco, California. Findings of Fact The facts stipulated by the parties are found as agreed to by them. Petitioner Giulio Particelli, a resident of Sebastopol, California, and the decedent in Docket No. 25440 were at all times material husband and wife. Giulio Particelli, whose transactions gave rise to the question in issue, will be referred to for convenience as the petitioner. Petitioner was born in 1891 and migrated to this country from Italy. He speaks and understands but can not read English. His spoken English is a somewhat broken dialect and is difficult for those not accustomed to it to understand. Petitioner commenced the production of wine on a small scale on his farm shortly after the repeal of prohibition. In 1941 he commenced and, prior to the grape crush in 1943, fully completed the construction of a larger winery at Forestville, California, known as the Lucca Winery. The winery was equipped to crush grapes, to ferment the juice into wine, to rack and filter wine and store 256,000 gallons. The winery was not equipped to finish wine beyond the aging, racking and filtering stages. Petitioner's equipment *320 for bottling wine was located in his retail store, which was located about 300 feet from the winery. Prior to October 22, 1943, the Office of Price Administration, hereinafter referred to as "OPA", had a ceiling on bulk dry wine of 21 1/2 cents a gallon, plus an amount not in excess of about 6 cents a gallon, computed on the basis of cost of grapes in 1942 over 1941, not exceeding $28.10 a ton. Effective October 22, 1943, the OPA placed a flat ceiling of 28 cents a gallon and 33 cents a gallon on bulk current red and white wines, respectively. At the same time it set flat ceilings for bottled wines. Petitioner sold wine of his own production and of established wine-makers. His wine was not finished and was the poorest and cheapest of the grades which he sold. His own wine would could and he could not sell it in bottles. He sold his own wine only in bulk in lots of 5, 10, 15, 25 or 50 gallons, or in carload lots when blended with finished wines. He generally sold the other wines in one-fifth, half-gallon and gallon bottles. Most of the wine sold by petitioner in 1943, prior to November of that year, had been purchased from other producers. The various types and classes of the *321 wine were sold from 45 cents to $1.40 a gallon. He sold his own production of wine for 32 cents a gallon in 50-gallon lots, 33 to 35 cents in 25-gallon lots, and 38 cents a gallon in 5-gallon lots. All of the prices included Federal and state alcoholic beverage taxes, which in 1943 totaled 11 cents a gallon. During the same period petitioner made one sale of about 60,000 gallons of wine in carload lots to a winery located in Ohio. The wine so sold was a blend in the ratio of ten parts of his production in 1942 to one part of some finished wine which he had purchased from another winery. The OPA ceiling price for the wine was about 27 1/2 cents a gallon. The proceeds of the sale were $51,800.95. Petitioner's crush of wine in 1943, consisting of about 245,000 gallons, was started in September and was completed in November. At that time he had about 30,000 gallons of wine on hand from his crush of about 100,000 gallons in 1942. The cost of the wine produced by petitioner in 1943 was from 50 cents to 52 cents a gallon. At that time he and other wine producers expected that the OPA would increase the ceiling price of wine sold in bulk. A blend of finished wine with unfinished wine *322 will not produce finished wine. The winery which on two occasions had finished some wine for petitioner refused to do so again. Unless he could have his wine finished or blend it with finished wine petitioner could not sell his wine as case goods, because it would cloud and spoil, but he could sell it in bulk. In December 1943 petitioner's prior sources of supply for finished wine in bulk for blending purposes refused to sell him finished wine except as case goods, the price of which made the cost too high to use for blending. Petitioner, since 1934, had had a line of credit from the Bank of Sonoma County or its predecessor on a secured and unsecured basis. On December 1, 1943, petitioner owed the bank $70,000 secured by all of his assets. Orders issued by the Federal government to control the disposition of grapes created a scarcity of grapes in 1942 and 1943 available for producing wine and intensified the extremely high demand for wine in those years. During 1942 and 1943 the price of grapes was not subjected to regulation by public authority. In 1942 wineries paid an average of $30 a ton for grapes and in 1943 an average of $79. The normal crush of dry wine from a ton of grapes *323 is about 160 gallons. Prior to 1942 about 80 per cent of all the wine produced in California was sold in bulk. Thereafter, there was a trend toward sales of wine in bottles, and by October or November 1943 bulk sales of unfinished wine had practically ceased. By the end of 1943 bulk sales of unfinished wine at the prevailing ceiling prices had ceased entirely. The cost of grapes in 1943 prevented wine producers from making a profit on bulk sales of unfinished wine at the ceiling price. There was no active market for wineries in 1943 without an inventory of wine. During that year, to obtain wine, bottlers were compelled to buy the winery in order to obtain the owner's inventory of wine. During 1943 three methods were used by operators of wineries to legally dispose of their inventory of unfinished wine at prices in excess of OPA ceilings on bulk sales. One of the methods, known as contract or franchise bottling, which was commenced about October 1943, consisted of shipping the wine to a bottler to be bottled for the account of the winery, and then selling the bottled wine to the bottler. That method enabled the wine producer to obtain from 75 cents to $1.25 a gallon for his wine, *324 depending upon its quality. Another plan, adopted in 1942, consisted of a sale by the wine producer of his inventory of wine and winery in one transaction for a lump sum price. The other method was one in which a bottler acquired the production of a winery by advancing funds for grapes to be crushed for the account of the bottler. The OPA issued a ruling in the fall of 1943 in response to a request of the Wine Institute, a trade and service organization for the wine industry of California, which constitutes about 90 per cent of the wine industry of the United States, that it would not interfere with the contract or franchise bottling method. During 1942, 1943 and 1944, 50 to 60 wineries in California, which constituted more than one-half of the production capacity of wineries in California, were purchased in order to obtain their inventories of wine. Of the 50 to 60 wineries so sold during the period of 3 years, 20 or 25 were sold in 1943. In 1943 bottlers of wine searched sources of supply for wine and a producer was not required to exert any effort to sell his wine. In December 1943 John Dumbra, hereinafter referred to as Dumbra, was in California for the purpose of locating wine *325 for purchase by his employer, the Tiara Products Co., general wine merchants, hereinafter referred to as Tiara, with its principal office in New York City. Dumbra first discussed the purchase of wine from petitioner in Santa Rosa, California, the evening of December 4, 1943. After tasting the wine at the Lucca Winery the next day and finding it satisfactory, Dumbra offered to purchase three or four cars of the wine at petitioner's price. Petitioner's ceiling price for the wine was not discussed. Petitioner's reply to the offer was that he could not make a profit on sales of his wine in such quantities and as he wished to get out of the winery business, the only transaction he would consider would be one for the purchase of all of his wine and the winery. Further discussions resulted in an offer of petitioner to sell his inventory of wine and the winery for $350,000. Dumbra made a counteroffer of $330,000, subject to approval of his principal. Later the same day Dumbra consulted his brother, Victor Dumbra, president and general manager of Tiara, who authorized him to buy the wine and winery, paying, if necessary, the asking price of petitioner. Tiara did not want the winery but was *326 willing to acquire it, if necessary, to obtain the wine at an overall price it could afford to pay. Petitioner would not accept less than $350,000 for the winery and his inventory of wine and Tiara accepted petitioner's offer to sell at that price. Petitioner informed Dumbra that "he was going to draw up the whole thing together," specifying one price for the wine and another for the winery and that "the price would be $350,000", to which Dumbra had no objection, provided the price did not exceed $350,000 and the quantity of wine was correct. Dumbra did not at any time agree to purchase the wine for $77,000 and the winery for $273,000. Tiara was compelled to purchase the winery to obtain the wine. While Dumbra at times felt that he was not understanding petitioner correctly, all of his doubts in that regard were eliminated before the negotiations were completed. Dumbra and petitioner met in the office of petitioner's accountant in San Francisco on December 6, 1943. While there petitioner requested his accountant to compute the ceiling price on sales of bulk wine, which he did, and determined a price of not in excess of 28 cents a gallon, and so advised petitioner. Thereafter, on *327 the same day, petitioner and Dumbra, acting for Tiara, executed an instrument reading in part as follows: "AGREEMENT OF SALE "Receipt of the sum of $5,000.00 to apply on the total purchase price of $350,000.00 is hereby acknowledged this sixth day of December, 1943, by the undersigned, G. PARTICELLI, for the following purposes: "It is hereby understood and agreed that the said G. Particelli will sell to JOHN DUMBRA, and the said John Dumbra agrees to buy, all that certain winery known as LUCCA WINERY located at Forestville, Sonoma County, California, together with two acres more or less of land on which said winery is located, all buildings now located thereon, all fixtures, equipment, supplies (other than wine), goodwill, trade names, formulas, and all other personal property of every kind and description now belonging to or a part of said Lucca Winery, for the total sum of $273,000.000. "It is further understood and agreed that the said G. Particelli will sell to John Dumbra, and the said John Dumbra agrees to buy, 275,000 gallons of wine now in storage in said Lucca Winery at the total price of $77,000.00. "It is further understood and agreed that the balance of said total *328 purchase price for both the said winery and wine, amounting to $345,000.00, will be paid on or before December 21, 1943, at which time said G. Particelli agrees to furnish clear title to said real and personal property." * * *
The agreement was drafted by petitioner's attorney in accordance with instructions given to him by petitioner. The Bank of Sonoma County acted as escrow agent for the parties in completing the transaction. On December 21, 1943, Tiara's attorney signed on behalf of Tiara, and delivered two letters of instructions to the escrow agent. One of the letters recited that Tiara was transmitting its check for $77,000 for delivery to petitioner upon the delivery of a bill of sale for 256,000 gallons of dry table wine located at Lucca Winery and 19,000 gallons of like wine located in the Scatena Bros. Winery, Healdsburg, California. The other letter recited that there was transmitted therewith Tiara's check of $268,000 for delivery to petitioner upon receipt of a deed and bill of sale for all of the property in the Lucca Winery other than the wine. Petitioner directed the escrow agent in writing to deliver his bill of sale for the wine on payment of the amount *329 of $77,000 "which represents a sale of 275,000 gallons of wine at our ceiling price of 28" per gallon." Other instructions of petitioner to the escrow agent were to deliver the deed and bill of sale covering the winery to Tiara upon receipt of the amount of $268,000 and authorized it to place revenue stamps of $110 on the deed. The revenue stamps were based on a valuation of $100,000 for the real estate conveyed. The amounts of the checks actually delivered to the escrow agent with the letters were $330,000 and $15,000. Delivery of the deed and bill of sale for the winery was to be made not later than March 1, 1944, and was not actually made until May 1, 1944, on account of delay in obtaining a license in the name of the buyer. The proceeds of the checks totaling $345,000 were credited to the bank account of petitioner on December 31, 1943. The wine and winery were entered on the books of Tiara at cost prices of $77,000 and $273,000, respectively. The amounts were used as cost in income and excess profits tax returns of Tiara. The entries were made by a bookkeeper under the supervision of Tiara's independent accountant, who obtained the figures entered in the books from the letters *330 of instruction of the petitioner and Tiara to the escrow agent and the sales contract. The accountant was the tax adviser of Tiara but was not consulted by anyone on behalf of Tiara prior to the purchase about any aspect or consequences of the purchase. The figure of $77,000 was entered in the books as the cost of the wine because that amount was set up in the contract of sale as the selling price. Victor Dumbra did not learn of the entry for the wine until some undisclosed time after it was made. Tiara did not in 1943 endeavor to purchase or purchase a winery without wine. It considered that it was paying from $1 to $1.12 per gallon for the wine acquired from petitioner, which was a price it could afford to pay in view of the prevailing high ceiling prices for wine in bottles, and the remainder for the winery. Tiara purchased the winery in order to obtain the wine. Tiara could make a net profit of about $2 a gallon on bottled wine, less the cost of the wine itself. There was no active market in 1943 and 1944 for wineries without an inventory of wine to sell with it. A few months after acquiring title to the Lucca Winery, Tiara offered the property for sale at the price of $60,000 *331 but would have accepted an offer of $55,000 or $50,000. It refused offers of $40,000 and $45,000. There was a break in the market for wineries producing dry wines and the winery was sold in December 1944 for $20,000. Tiara's accountant advised it in 1944 that there would be a tax advantage to it in selling the winery in that year. Tiara purchased wineries, other than the Lucca Winery, with their inventories of wine. One of such purchases was made in California in December 1943. At the time of their acquisition Tiara understood that regulations of the OPA permitted it to sell the wine so acquired at its ceiling prices for bulk and case goods. During the latter part of 1944 it learned that such ceiling prices applied only on deliveries of wine to customers from its own facilities and if it made deliveries to the customer from the winery which produced the wine, the applicable ceiling price was the ceiling of the winery which had been purchased. From 40 per cent to 50 per cent of the wine acquired by Tiara from petitioner was sold direct to customers from the Lucca Winery. Petitioner was employed by Tiara in December 1943 at a salary of $100 per week to take care of the Lucca Winery. *332 Before the sale involved herein was closed petitioner, with the consent of Tiara, withdrew 1,000 gallons of the wine for his personal use. In May 1944 when the contract of employment was terminated and Tiara owed petitioner $1,500 for his services, petitioner allowed Tiara a credit of $1,000 for the wine withdrawn by him. Of the total consideration of $350,000 involved in the transaction, $275,000 was paid for the wine and $75,000 for the winery. In their returns for 1943 petitioners reported that the sale of Tiara on December 6, 1943, constituted a sale of wine for $77,000 and the winery for $273,000. Capital gain on the sale of the winery was computed on a cost basis of $61,165, less $5,799 for depreciation. In his determination of the deficiencies, respondent allocated $302,500 of the total selling price to the sale of wine and $47,500 to the winery and decreased the adjusted cost basis of the winery to $26,420. Opinion HILL, Judge: The gist of the contention of petitioners is that the parties entered into an arm's length transaction for the sale of the wine for $77,000 and the winery for $273,000, which agreement they embodied in the contract of sale and that the contract, *333 therefore, not being a sham, the respondent has no power to disregard it. Respondent argues that the substance of the transaction was a sale of the two classes of property for $350,000 without any agreement on the purchase price of each and that under the circumstances his allocation on the basis of fair market value was proper. If there was an arm's length sale of the wine and the winery at fixed prices, as alleged by petitioners, no allocation would be necessary. . Whether there were separate sales as contended by petitioner or one for a lump sum, as respondent alleges, is a question of fact to be determined from a consideration of all of the evidence. The instrument signed by the parties on December 6, 1943, is not controlling if the form thereof differs from the substance of the transaction. To arrive at the substance of the sale, all relevant facts of the transaction must be taken into account and considered as a whole. In , the Court, in considering a question of whether a sale was in substance made by a corporation or its stockholders, said: "* * * The incidence of taxation *334 depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." , involved a like question. The Court's decision there, as in the Court Holding Co. case, rested upon the ultimate finding of the trial court. It remarked that "It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs" and in determining the question, we could look beyond the papers executed by the corporation and the shareholders *335 and "consider motives, intent, and conduct in addition to what appears in written instruments used by the parties to control rights as among themselves." The testimony of petitioner and that of other witnesses whose testimony he relies upon is to the effect that there were separate negotiations for each class of property. Other evidence cited by respondent to support his determination of a sale for a lump sum without an agreement on the selling price of the wine or winery is, in our opinion, more reasonable and therefore entitled to greater weight. No useful purpose would be served by a detailed discussion of all of the conflicting evidence. At the time the transaction occurred wine was scarce and in great demand by bottlers. The ceiling price for the wine in petitioner's inventory was only about 55 per cent of its cost. Bottlers of wine, who had a high ceiling price for case goods, could pay considerably more than the ceiling price on bulk sales and still make a profit. Three methods were available to wine producers to dispose of their stocks of wine at a price in excess of 28 cents a gallon without violating regulations of the OPA. One of the methods was to sell the winery with *336 its inventory of wine. That method was used numerous times in California in the taxable year. While there was no direct proof that petitioner was aware of the three courses available to him for the sale of his wine for more than the prevailing ceiling price for wine alone, the inference is that they were known to him and that he availed himself of one of them. The sale involved here was made while those conditions prevailed. Petitioner testified, in effect, that after sampling the wine at the winery on December 5, Dumbra accepted his offer to sell all of the wine at the prevailing ceiling price for sales in bulk, the amount to be determined by his accountant, that promptly after their oral agreement on the wine, Dumbra disclosed a desire to purchase the winery but declined to purchase it for his asking price of $300,000, that while in the office of his accountant the next day Dumbra offered $273,000 for the winery, which he accepted, and that thereafter "we told them to draw up two deals, one for the winery and one for wine." Other testimony relied upon by petitioner adds nothing to his statement of the negotiations. John Dumbra, a disinterested witness who negotiated the purchase *337 for Tiara, testified that after finding the wine to be satisfactory on December 5, he first offered to buy four carloads and then three carloads of the wine. Petitioner's response to the offer was, in substance, that he could not make a profit on sales of that quantity, [1] and that in view of the fact that he wanted to get out of business he would not consider the sale of any quantity of wine less than his entire inventory, and the winery, for both of which he set a price of $350,000; that he, Dumbra, then made a counteroffer of $330,000 which petitioner refused; that after consulting his principal, petitioner's original offer was accepted, after which petitioner informed him that he would have the contract of sale prepared to show a sale of the wine at one price and the winery at another, the total to be $350,000, to which there was no objection provided the price did not exceed $350,000 and the quantity of wine was correct, and that he did not at that time make a separate agreement for the purchase of the wine for $77,000 and thereafter ask petitioner if he would be interested in the sale of his winery or make a separate agreement for the purchase of the winery for $273,000. *338 Victor Dumbra testified that John Dumbra was sent to California with instructions to buy wine and to consult him about deals involving other than a few cars of wine; that it was a known fact that large quantities of wine were being sold "either as a stock sale or total sale of company"; that he did not endeavor to buy or buy a winery without wine in 1943; that while seeking wine for purchase, wineries were offered for sale with the wine, and that in such cases an evaluation was made to determine whether the winery offered with the wine in one transaction made the cost of the wine more than his company could afford to pay; and that when John consulted him about the deal with petitioner, he agreed to the overall price of $350,000 asked by petitioner. The testimony of the Dumbras is supported by other evidence. Petitioner in December 1943 informed F. Aberigi, who lived in or near Sebastopol and had known petitioner for about 50 years, that Tiara wanted to buy the wine only but "to make it legal on account of the O.P.A. ceiling" he sold "the winery and everything," that he received $1 a gallon for his stock of 400,000 gallons of wine and "Throw in the good will and the winery," and *339 that he could not have obtained a dollar a gallon for the wine if he had sold the wine only. Petitioner had previously informed Aberigi of a sale over objections of the former's daughter of 100,000 gallons for 70 cents a gallon. When making settlement in May 1944 with Tiara for its indebtedness to him for services, petitioner agreed to the application of a credit of $1,000, or $1 a gallon, for wine withdrawn by him after the sale for his personal use. Upon being questioned about the credit on cross-examination, petitioner first testified that the adjustment was on the basis of the price paid to him, which was the ceiling price of 28 cents a gallon and then, after further examination, that "they give it to me for the ceiling price like I sold to him", and that the credit for $1,000 was his or Tiara's attorney's mistake. Instead of a mistake, our opinion is that the parties agreed that the credit was a fair estimation of the amount paid by Tiara for the wine. Victor Dumbra testified that if Tiara had paid the full amount of $1,500 to petitioner, it "would have expected $1,000 back in cash, definitely." Moreover, petitioner instructed the escrow agent to affix revenue stamps on the *340 deed for the winery on the basis of a valuation of $100,000. A valuation of that amount would leave out of the total consideration a selling price of about 91 cents a gallon for the wine, contrary to the contention being made it was sold for the ceiling price of 28 cents a gallon. The evidence must be viewed in the light of proof that Tiara was primarily interested in buying wine needed to remain in business and was willing to purchase wineries only when necessary to obtain wine at an overall price it could pay. Its lack of interest in wineries without a dependent sale of wine is otherwise shown by the fact that a short time after acquiring title to the Lucca Winery, Tiara put the property up for sale for $60,000 and in December 1944 actually sold it for $20,000. Petitioner, in effect, concedes that the winery had an original cost in 1943 of about $32,000. Victor Dumbra testified that when considering the purchase from petitioner he made a mental calculation of the transaction and concluded that the winery might be worth $50,000 or $60,000. It is apparent that under the circumstances Tiara would not have agreed to pay $273,000 for the winery and our opinion is that it did not so *341 agree. Entries made in the books of Tiara showing a cost of $77,000 for the wine and $273,000 for the winery are not conclusive. . The books merely follow the written contract of sale. We need not determine petitioner's motive for having the written contract of sale specify a separate sales price for each class of property. The terms of the agreement in that regard were a matter of indifference to Tiara. It was not necessary to comply with an OPA regulation for there was no ceiling on wine when sold as a part of the business and therefore compliance with the ceiling price on the wine was not the objective. Had the respondent accepted petitioner's representation of the sale, the result would have been a saving of tax to petitioner. In Estate of Jacob Resler, 17 T.C. - (January 2, 1952), there was no basis for concluding that any part of the consideration was paid for other than the property taken, and, accordingly, no allocation was necessary. We conclude from a consideration of all the evidence here that the written contract of sale does not reflect the agreement of the parties and that the substance of the transaction between *342 them was a sale of the wine and winery for $350,000 without any agreement on a selling price for each class of property. So concluding, it was proper for respondent to make an allocation to reflect the consideration paid for the wine and for the winery. ; ; ; . The statements attached to the notices of deficiency disclose that the apportionment made by the respondent of the total selling price was determined as "a fair allocation of the sale price of $350,000 * * *." He asserts on brief that the allocation was based upon fair market value of property. While contending that the allocation set forth in the contract of sale is binding upon the respondent, petitioners argue that if fair market value is used as a basis no more than $77,000 should be ascribed to the wine. They made no argument as to the fair market value of the winery. The petitioners' reasoning is that if the Government had seized the wine under an exercise of its power of condemnation, just compensation *343 to them would have been measured by the fair market value of the property and that the ceiling price of 28 cents a gallon for bulk wine fixed that value. They cite , and , to support the argument. There is no factual basis here for the application of the cases. The substance of the transaction here for tax purposes, as already pointed out, is an arm's length sale of two classes of property for one price for both without a ceiling price to limit the consideration. To apply the contention of petitioners to the winery would result in an absurdity, for the winery had a fair market value net in excess of $75,000 and, consequently, there would be an absence of assets to which to make an allocation of the remaining consideration paid in the transaction. One of respondent's witnesses placed a fair market value of $1 a gallon on the wine and another of his witnesses testified that dry wine had a fair market value ranging from 75 cents to $1 a gallon, depending upon its quality. Victor Dumbra, another witness for the respondent, first testified that *344 he did not know the approximate amount of consideration that he was paying for the wine but referred to costs of $1, $1.10 or $1.12 a gallon. Thereafter he testified that before authorizing his brother to enter into the transaction, he made a mental calculation of the amount Tiara would be paying for the wine and the winery and although he could not remember the amount he estimated as the cost of the winery, he mentioned the amounts of $50,000, $60,000 and $40,000 in that order. His testimony discloses that he considered that Tiara was paying at least $1 a gallon for the wine, a price petitioner settled with it for the 1,000 gallons he withdrew from the inventory after the sale was made. In his determination of the deficiencies, respondent allocated $302,500 to the sale of the wine, or $1.10 a gallon, and the remainder of $47,500 of the total selling price to the winery. Considering all of the evidence on the question we conclude that the wine was sold for $1 a gallon, or $275,000, and that the remainder of $75,000 represents the selling price of the winery. Decisions will be entered under Rule 50. Footnotes
1. The inference is that he had in mind his cost of production of about 50 cents a gallon and a ceiling price of 28 cents a gallon.↩